# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SARAH S.C. MOREAU, | § | |
| | § | |
| *Petitioner,* | § | Civil Action No. 4:24-CV-857 |
| v. | § | Judge Mazzant |
| | § | |
| ANDREW CHRISTOPHER WHITE, | § | |
| | § | |
| *Respondent.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pending before the Court is Petitioner Sarah S.C. Moreau's Verified Petition For Return Of Children To Canada & For Issuance of Show Cause Order (Dkt. #1).

On December 16, 2024, the Court held a bench trial in the above-styled matter. The bench trial concluded the following day. Appearing at the trial were Stephen Cullen and Kelly Powers, representing Petitioner, as well as John Kappel and Joshua Northam, for Respondent Andrew Christopher White. The guardian ad litem, L. Kirstine Rogers, was present for the *in camera* interview with the minor children.[1]

After consideration of the parties' arguments and of the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2] To the extent that any of the findings of fact constitute conclusions of law, or any of the conclusions of law constitute findings of fact, they are adopted as such.

---

[1] The Magistrate Judge appointed the guardian ad litem to "protect the children's interest and participate in proceedings on their behalf as needed" (Dkt. #11). The guardian ad litem has ably discharged her responsibilities.

[2] In preparing this Order, the Court carefully considered the entire record, including the pretrial filings, trial testimony, and trial exhibits, and subsequently applied the Fifth Circuit standard for findings and conclusions under Federal Rule of Civil Procedure 52. *See Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 935–36 (5th Cir. 2019); *see also* 9C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2579 (3d ed.).

## FINDINGS OF FACT

Having carefully reviewed the evidence and arguments presented at trial, the Court finds the following facts by a preponderance of the evidence.

### I.     The Relationship and the Children

1. Petitioner Sarah S.C. Moreau is the mother of two minor children, W.F.W. and C.C.W. (collectively, "the children") (*See* Dkt. #55-1 at pp. 46–47).

2. Respondent Andrew Christopher White is the father (Dkt. #55-1 at pp. 46–47).

3. Petitioner is a citizen of Canada and Respondent is a citizen of the United States (Dkt. #55-2 at p. 45).

4. Petitioner testified that the children, W.F.W. and C.C.W., are dual citizens of Canada and the United States. The Court finds Petitioner's testimony throughout the proceeding credible. Respondent agrees that the children are citizens of the United States, but he states that he lacks sufficient knowledge to confirm they are citizens of Canada (Dkt. #34 ¶ 3; Dkt. #57 at p. 12).

5. Petitioner and Respondent married on July 19, 2013, in New York (Dkt. #55-1 at p. 46).

6. In 2014, Petitioner and Respondent moved to Texas (Dkt. #1 ¶ 7; Dkt. #34 ¶ 7).

7. W.F.W. was born in 2015 and C.C.W. was born in 2017 (Dkt. #55-1 at p. 47).

8. In 2018, Petitioner and Respondent separated. However, they remain legally married to this day (*See* Dkt. #1 ¶ 9; Dkt. #57 at pp. 11–12).

9. Throughout his marriage with Petitioner, Respondent struggled with an addiction to alcohol. He also consumed illicit drugs such as cocaine, amphetamines, and methamphetamines (Dkt. #55-1 at p. 60; Dkt. #55-1 at p. 135; Dkt. #55-1 at p. 180).

10. Fearing for her own safety and the safety of the children, Petitioner filed her Original Petition for Divorce in the 303rd Judicial District Court ("Texas Court") in Dallas County, Texas, on

August 28, 2018 (Dkt. #55-1 at pp. 45–69). At that time, Petitioner, Respondent, and the children were domiciled in Dallas County, Texas (*See* Dkt. #55-1 at p. 45; *see also* Dkt. #1 ¶¶ 7–9; Dkt. #34 ¶¶ 7–9).

11. On the same day, the Texas Court issued an *ex parte* Protective Order against Respondent due to his family violence against Petitioner and the children (*See* Dkt. #55-1 at p. 1; Dkt. #55-1 at pp. 45–69; *see also* Dkt. #55-1 at p. 1).

12. On November 9, 2018, the Texas Court appointed Petitioner as Temporary Sole Managing Conservator of the children and appointed Respondent as Temporary Possessory Conservator of the children (Dkt. #1 ¶ 12; Dkt. #34 ¶ 12).

13. On December 16, 2019, Petitioner moved the Texas Court to allow her to relocate with the children to British Columbia, Canada (Dkt. #55-1 at p. 70).

14. Petitioner told the Texas Court that her desired relocation to Canada would be temporary (Dkt. #55-1 at pp. 221–23). Further, Petitioner demonstrated her understanding that if the Texas Court granted her permission to relocate to Canada, the move would only be temporary (Dkt. #55-1 at p. 223).

15. The same day, December 16, 2019, the Texas Court orally granted Petitioner the right to establish the children's primary residence without geographic restriction, the exclusive right to apply for and possess the children's passports, and the right to travel internationally with the children without Respondent's consent (*See* Dkt. #55-1 at pp. 70–72). The Texas Court signed a written order reflecting the same on February 25, 2020 (Dkt. #55-1 at p. 72).

## II.    The Move to Canada

16. Petitioner testified at trial that she and the children moved to British Columbia, Canada on December 17, 2019 (Dkt. #57 at pp. 10–11).

3

17. At the time Petitioner relocated to British Columbia, Canada with the children, W.F.W. was four years old and C.C.W. was two years old (*See* Dkt. #55-1 at p. 47; Dkt. #57 at pp. 10–11).

18. At trial, Petitioner testified that Respondent did not contact her or the children for almost two years while they lived in Canada (*See* Dkt. #1 at p. 4).

19. Respondent disputes this fact. He alleges that he attempted to contact Petitioner and the children through hundreds of emails to Petitioner (Dkt. #59 at pp. 32–33). The Court finds that Respondent's testimony throughout the proceeding lacks credibility. Notably, no such emails exist in the record.

20. Petitioner and the children settled into Canada. Petitioner testified that the children enrolled in Canada's healthcare system. The children also obtained documents attesting to their Canadian citizenship.

21. While in Canada, Petitioner was responsible for the children's wellbeing. Petitioner cared for the children, ensured that the children had adequate medical attention, enrolled the children in school, and made all necessary decisions regarding the children's upbringing (*See* Dkt. #54-5; *see also* Pet. Trial Exhibit 7).

22. Petitioner testified that she and the children moved in with her parents for a time. The children's relationship with their grandparents grew as they spent more time in Canada (*See* Dkt. #57 at pp. 13–14). Petitioner and the children then moved into an apartment for some time, and later a house in which each child has his own bedroom (Dkt. #57 at pp. 14–15). The children attended school in Canada, made friends with other children in Canada, and vacationed in Canada. The children also received routine medical check-ups throughout their time in Canada (*See* Pet. Trial Exhibit 7).

23. As Petitioner and the children spent more time in Canada—without any contact from Respondent—Petitioner changed her mind. She decided to make this move to Canada permanent. During trial, the Court asked Petitioner whether the move to Canada began as a temporary move (Dkt. #57 at pp. 151–53). Petitioner testified that the move was temporary at first, but over time became a permanent relocation (Dkt. #57 at pp. 151–53). This testimony is bolstered by the changes in Petitioner and the children's living circumstances. The Court notes that Petitioner and the children began their stay in Canada in temporary living conditions (staying with Petitioner's parents, then renting an apartment), but later transitioned to a permanent living situation (moving into a house) (Dkt. #57 at pp. 14–16). In Canada, Petitioner and the children have lived in the house for two-and-a-half years (Dkt. # 57 at p. 15).

24. Respondent eventually resurfaced in the fall of 2021 and began contacting Petitioner.

### III.    The Proceedings in the Texas and Canadian Courts

25. The complexity of these proceedings is akin to the fabled Gordian Knot. Accordingly, the Court will attempt to cut the knot by recounting only necessary proceedings and orders based upon the record before it.

26. On November 30, 2021, the Texas Court held a hearing on Respondent's First Amended Motion to Clarify Possession and Access and Further Temporary Orders (Dkt. #55-1 at p. 105).

27. On December 1, 2021, the Texas Court ruled on the Motion. Among other things, the Texas Court ordered that Petitioner make the children available to Respondent via Zoom, and that Respondent was free to communicate with the children through Petitioner's counsel and provide them with gifts (Dkt. #55-1 at pp. 105–07).

28. Respondent filed a Motion for Enforcement in the Texas Court. On June 24, 2022, the Texas Court ordered Petitioner to appear on July 11, 2022, to respond to Respondent's Motion (Dkt. #17, Exhibit 23).

29. On July 6, 2022, Respondent filed a Motion to Modify the temporary order in the Texas Court, and requested that Respondent be appointed as Temporary Sole Managing Conservator of the children with the right to designate the primary residence of the children within Dallas and contiguous counties in Texas and to prohibit Petitioner from removing the children from the same (Dkt. #1 ¶ 27; Dkt. #34 ¶ 27).

30. On July 7, 2022, Petitioner filed a Motion to Bifurcate and Transfer in the Texas Court, requesting that the Texas Court transfer the suit affecting the parent-child relationship to the Canadian courts (Dkt. #17, Exhibit 21). The Texas Court denied the Motion.

31. On an unspecified date, Petitioner commenced proceedings in the Supreme Court of British Columbia by filing a Notice of Family Claim and a subsequent Notice of Application (Dkt. #27-7 at p. 2; Dkt. #27-8). Through them, Petitioner sought a non-removal order to prevent the removal of the children from British Columbia (*See* Dkt. #27-8).

32. On September 15, 2022, Justice Gaul of the Supreme Court of British Columbia ordered, among other things, Petitioner to have sole parental responsibilities for the children (Dkt. #54-6). Further, the court ordered Respondent not to remove the children from British Columbia (Dkt. #54-6 at pp. 3–4).

33. On September 29, 2022, Justice Power of the Supreme Court of British Columbia upheld several provisions of Justice Gaul's Order, including the provision providing Petitioner with sole parental responsibilities for the children (Dkt. #54-6). Justice Power's Order sought to

maintain the status quo until the Texas Court could decide Petitioner's Motion to Transfer the parent-child relationship dispute to the British Columbia courts (Dkt. #54-6 at pp. 1–2). Additionally, Justice Power upheld the provision that prohibited Respondent from removing the children from British Columbia (Dkt. #54-6 at pp. 1–2).

34. On March 23, 2023, Petitioner filed her Motion to Dismiss for Inconvenient Forum and Plea to the Jurisdiction, requesting that the Texas Court dismiss the portion of the suit affecting the parent-child relationship (Dkt. #17-16). The Texas Court denied the Motion on May 12, 2023 (Dkt. #17-18).

35. On August 1, 2023, the Texas Court held a Temporary Custody Order hearing. At this hearing, Petitioner represented she understood that the Texas Court had temporarily allowed her to move (Dkt. #55-1 at p. 252). However, Petitioner also noted that, at some point, the move to Canada became a permanent plan (Dkt. #55-1 at pp. 254–55).

36. On August 2, 2023, the Texas Court issued an order that, among other things, appointed Petitioner and Respondent as Temporary Joint Managing Conservators (Dkt. #55-1 at p. 75). Petitioner was granted the right to determine the primary residence of the children (Dkt. #55-1 at p. 75). Further, the Texas Court ordered that until July 1, 2024, the children's residence would be restricted to Dallas County and Collin County as well as Victoria Island, British Columbia (Dkt. #55-1 at p. 75). Beginning July 1, 2024, however, the residence of the children would be restricted to Dallas County and Collin County (Dkt. #55-1 at p. 75). The Texas Court also ordered the parties to agree on a school to enroll the children in for the 2024–25 school year (Dkt. #55-1 at p. 75). Petitioner was allowed to maintain the children's passports and Respondent was required to continue testing for drugs and alcohol (Dkt. #55-1 at p. 76). The

parties subsequently modified this order on two occasions—on August 15, 2023, and September 1, 2023—through Rule 11 agreements (Dkt. #55-1 at pp. 78–83). This order posed problems for Petitioner, who had relinquished her status as a Legal Permanent Resident in the United States and would need to obtain authorization to legally reside in the United States.

37. On November 7, 2023, Petitioner moved the Texas Court to order a custody evaluation (Dkt. #55-1 at p. 32).

38. On November 14, 2023, Petitioner filed a request for a jury trial on the divorce and child in the Texas Court (Dkt. #55-1 at p. 32).

39. On January 24, 2024, Petitioner filed her Emergency Motion for a Continuance, which also requested that the Texas Court hold a pre-trial hearing and set a trial date (Dkt. #55-1 at pp. 202–06).

40. On June 10, 2024, Petitioner filed a motion in the Texas Court requesting that it reconsider its August 2, 2023, order[3] (Dkt. #55-1 at p. 37).

41. Also on June 10, 2024, Petitioner filed another motion asking the Texas Court to order a custody evaluation (Dkt. #55-1 at pp. 180–83).

42. On June 14, 2024, Petitioner filed her Second Amended Motion to Dismiss and Request for Court to Decline Jurisdiction in the Texas Court. Through it, she argued that the Canadian court should determine the parent-child relationship because the children had exclusively resided in British Columbia for four-and-a-half years (Dkt. #17-11). Further, the children were nine and six at the time. Thus, four-and-a-half years in Canada represented at least half of their

---

[3] As the Magistrate Judge aptly noted, "[t]he correct date of this order is not clear. Petitioner alleges that it was entered on August 2, 2023 (Dkt. #1 at p. 5) and Respondent alleges that it was entered on August 1, 2023 (Dkt. #17 at p. 4). However, the order was signed on June 28, 2024 (Dkt. #17, Exhibit 10)" (Dkt. #24 at p. 3 n.1). The Court concludes that the August 2, 2023, order was modified on June 28, 2024.

lives (Dkt. #17-11 at pp. 2–3). Petitioner also noted that the children had not been in Texas from December of 2019 to July of 2023 and had only visited Texas seven times since July 2023 (Dkt. #17-11 at p. 3). The Texas Court denied this Motion.

43. On June 17, 2024, the Texas Court entered a pretrial order (Dkt. #55-1 at p. 214).

44. On June 21, 2024, Petitioner moved the Canadian court for an order that British Columbia is the children's habitual residence, and for an order extending the non-removal order from September 2022 (Dkt. #55-2 at pp. 1–12).

45. On June 28, 2024, Justice Tucker of the Supreme Court of British Columbia issued an order regarding both parties' claims for relief. Respondent sought to vacate the previous Canadian orders and argued that the Canadian court lacked jurisdiction over the matter (Dkt. #55-2 at p. 18). Respondent also argued that if the Canadian court determined it did have jurisdiction, it should decline to exercise it over the matter because Texas was the more appropriate forum (Dkt. #55-2 at p. 18). Petitioner argued that the previous orders by the Canadian court were proper and consistent with the proceedings in Texas (Dkt. #55-2 at pp. 18–19). Responding to these arguments, Justice Tucker set aside Justice Gaul's order dated September 15, 2022, and Justice Power's order dated September 29, 2022 (Dkt. #55-2 at pp. 13–42). Further, Justice Tucker declined to exercise jurisdiction over the child custody matters and ordered that the proceedings in British Columbia be stayed (Dkt. #55-2 at pp. 13–42).

46. Also on June 28, 2024, the Texas Court issued an order regarding Petitioner's First Amended Emergency Application for Temporary *Ex Parte* Restraining Order (Dkt. #55-1 at pp. 84–89). Among other things, the order provided Respondent with periods of unsupervised possession of the children in the United States, and provided details of how possession of the children

would take place in Texas (Dkt. #55-1 at pp. 85–86). Further, the Texas Court ordered that Respondent was still required to submit to testing for drugs and alcohol (Dkt. #55-1 at p. 87).

47. Later on June 28, 2024, the Texas Court issued an order on Respondent's First Amended Motion for Expanded Possession and Passports, as well as Petitioner's Motion to Modify Further Temporary Orders (Dkt. #55-1 at pp. 90–104). The Order, among other things, elaborated on the conservatorship of the children and how the parties would allocate responsibilities (Dkt. #55-1 at pp. 91–92). Further, the Order required the children to reside in Texas after July 1, 2024. The Order specified that the children must be enrolled in a Texas public school for the 2024–25 school year (Dkt. #55-1 at p. 93).

48. On July 8, 2024, the Texas Court ordered Petitioner to surrender the children to Respondent the following day on the basis that Petitioner had illegally confined and restrained the children in Canada (Dkt. #55-1 at pp. 108–12).

49. On July 9, 2024, Respondent moved the Canadian court for an *ex parte* order allowing Respondent to remove the children from British Columbia (Dkt. #54-16). The basis of the Motion was Respondent's fear that Petitioner would disappear with the children into the Canadian wilderness with her father or flee to Iran with a friend with close ties to the Iranian government (Dkt. #54-16 at p. 3).

50. Late on July 9, 2024, the Canadian court issued an *ex parte* order permitting Respondent to remove the children from Canada (Dkt. #55-2 at pp. 56–58). That day, local police arrived at Petitioner's home in British Columbia to remove the children, only to find that no one was home (Dkt. #1 ¶ 38; Dkt. #34 ¶ 38).

51. After learning of the *ex parte* order, on July 10, 2024, Petitioner moved the Canadian court to stay its July 9, 2024, order (Dkt. #1 ¶ 40; Dkt. #34 ¶ 40).

52. On July 12, 2024, Petitioner filed a Petition for a Writ of Mandamus in the Fifth District Court of Appeals at Dallas ("Texas Court of Appeals") (Dkt. #55-1 at p. 116). Petitioner requested that the Texas Court of Appeals require the Texas Court to vacate its order that established both parties as joint managing conservators and the orders directing that the children be returned to Texas from Canada (Dkt. #55-1 at pp. 116–40). The Texas Court of Appeals denied Petitioner's Petition for Writ of Mandamus (*See* Dkt. #55-1 at p. 141).

53. On July 15, 2024, the Texas Court issued another order to effectuate the return of the children to Respondent (Dkt. #55-1 at p. 113). The order allowed Respondent to pick up the children wherever they could be found (Dkt. #55-1 at p. 113). This order occurred before the Texas Court of Appeals ruled on Petitioner's Petition for a Writ of Mandamus.

54. Also on July 15, 2024, Justice Morley of the Supreme Court of British Columbia entered an order that, among other things, superseded portions of the Texas Court's orders regarding possession of the passports (Dkt. #54-7). It also lifted portions of Justice Tucker's order that was issued on June 28, 2024 (Dkt. #54-7 at p. 1). Justice Morley also set aside provisions of his order issued on July 9, 2024, which recognized orders issued by the Texas Court on June 28, 2024, and July 8, 2024 (Dkt. #54-7 at p. 1).

55. On July 19, 2024, the Texas Court held a hearing on Petitioner's Motion to Reconsider the Texas Court's Order requiring Petitioner to return the children to Respondent (Dkt. #55-1 at pp. 258–75). The Texas Court denied the Motion on July 19, 2024 (Dkt. #55-1 at p. 114).

56. On July 25, 2024, the Texas Court ordered that Respondent had the exclusive right to designate the children's primary residence in Dallas and Collin counties (Dkt. #55-1 at p. 115). Further, the Texas Court ordered that the children were to attend public school zoned to Respondent's residence (Dkt. #55-1 at p. 115). The Order also required that Petitioner's visits with the children take place within Dallas County or Collin County (Dkt. #55-1 at p. 115).

57. On August 2, 2024, Justice Morley of the Supreme Court of British Columbia issued an order, by consent of the parties, requiring the children to be turned over to Respondent's father and arranging for travel between the United States and Canada (Dkt. #54-9). Justice Morley further ordered that the children were permitted to be with Respondent in Texas from August 4, 2024, until August 29, 2024 (Dkt. #54-9). Justice Morley ordered this arrangement because Respondent was still seeking enforcement of the Texas orders entered on June 28, July 8, and July 19, 2024, that provided Respondent with custody of the children and ordered the children's travel to Texas (Dkt. #54-9 at p. 1). At this time, none of the Texas Court's orders were operative in Canada because a Canadian court had not yet recognized the Texas Court's orders. Thus, Justice Morley fashioned a temporary remedy. Justice Morley's order provided that the children were to travel to Texas to spend time with their father until Justice Morley could fully consider the arguments regarding recognition of the Texas Court orders. Justice Morley crafted this relief based on Respondent's representation that he would comply with the Canadian court's Order to return the children to Canada and appear before the Canadian court to argue for recognition of the Texas Court's orders (*See* Dkt. #54-9 at p. 2). In sum, the Canadian court entered "a consent [O]rder 1) staying the matter until August 2024; 2) requiring Petitioner to facilitate visits to Texas until August 29, 2024; 3) ordering Respondent

to return the children and their passports to British Columbia on August 29, 2024; and 4) scheduling a hearing for August 30, 2024" (Dkt. #24 at p. 5).

58. On or about August 5, 2024, Respondent retained the children in Texas when he informed Petitioner that the children would start school in Texas on August 8, 2024 (*See* Dkt. #1 ¶ 56; Dkt. #34 ¶ 56).

59. On August 8, 2024, Petitioner filed a Petition for Writ of Mandamus in the Supreme Court of Texas, which was denied on August 29, 2024 (Dkt. #55-1 at pp. 141–70; Dkt. #17-8).

60. On August 30, 2024, the Texas Court issued a Temporary *Ex Parte* Restraining Order and Order Setting Hearing (Dkt. #55-1 at pp. 171–73). The Order provided that the children were habitual residents of the United States and implemented measures that restricted Petitioner's access to the children (Dkt. #55-1 at p. 171).

61. On September 10, 2024, Petitioner filed her Motion to Extend Deadline to Complete Parenting Course (Dkt. #55-1 at pp. 215–16).

62. On September 11, 2024, Justice Morley of the Supreme Court of British Columbia issued an order regarding Respondent's retention of the children in Texas (Dkt. #54-11). In it, Justice Morley declared that the children were and continue to be habitually resident in British Columbia and had been since December 17, 2019 (Dkt. #54-11 at p. 31). Justice Morley also held that Respondent was in breach of the terms of the court's order—to which Respondent consented—requiring the children to be returned to Petitioner's care on August 29, 2024 (Dkt. #54-11 at p. 31).

63. On September 17, 2024, Respondent filed his Motion for Contempt against Petitioner for her violation of the Texas Court's order dated July 8, 2024, ordering the return of the children from Canada to the United States (Dkt. #17-20).

64. On September 20, 2024, pursuant to Petitioner's consent, the Texas Court extended, its restraining order (Dkt. #55-1 at p. 174–79).

65. On September 24, 2024, Petitioner filed her Verified Petition For Return Of Children To Canada & For Issuance Of Show Cause Order in the United States District Court for the Eastern District of Texas, Sherman Division (Dkt. #1).

66. The Court held a bench trial on December 16, 2024. The bench trial ended the following day.

## IV. *In Camera* Interview of W.F.W.

67. Respondent requested that the Court conduct an *in camera* interview with W.F.W. because of Respondent's affirmative defense of the age and maturity exception to the Hague Convention (Dkt. #34 at pp. 21–22). Respondent suggested that neither the parties nor their counsel should be present during the interview (Dkt. #34 at p. 22).

68. The guardian ad litem filed her Report and concluded that "the age and maturity exception to the Hague Convention" should not apply to W.F.W. (Dkt. #38 at p. 9).

69. On December 16, 2024, after the first day of the bench trial, the Court conducted an *in camera* interview with W.F.W. The Court, the Court Reporter, the guardian ad litem, the Court's law clerk, W.F.W., and C.C.W. were present for the *in camera* interview.[4]

---

[4] The Court prepared cookies for the children because it was C.C.W.'s birthday, and with permission of the parties, the children enjoyed them during the *in camera* interview (*See* Dkt. #57 at pp. 313–14).

70. During the *in camera* interview, the Court asked both W.F.W. and C.C.W. questions. The Court, however, only used W.F.W.'s responses in determining the applicability of the age and maturity exception because Respondent did not assert the exception was applicable to C.C.W.

## CONCLUSIONS OF LAW

71. The Court has jurisdiction over the parties and the claims herein.

## I.     The Hague Convention Framework

72. The Hague Convention ("Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 90001–11, "entitle[s] a person whose child has been wrongfully removed to, or wrongfully retained in, the United States, to petition a federal court to order the child returned." *De La Rosa v. Alonso*, 2024 WL 4646975, at *2 (E.D. Tex. Oct. 30, 2024). "The Convention and ICARA empower federal courts in the United States to order the return of children removed or retained in violation of the Convention." *Id.* (citing 22 U.S.C. § 9001(b)(4); *Abbott v. Abbott*, 560 U.S. 1, 9 (2010)). Notably, "neither the Convention nor ICARA authorize courts to determine the merits of the underlying custody dispute." *Id.* (citing *Smith v. Smith*, 976 F.3d 558, 561–62 (5th Cir. 2020)). Rather, the Court's role in this dispute "is limited to determining whether or not the child has been wrongfully removed from their country of 'habitual residence.'" *Delgado v. Osuna*, 837 F.3d 571, 577 (5th Cir. 2016) (cleaned up); *see also Esparza v. Nares*, No. 4:22-CV-03889, 2022 WL 17724414, at *2 (S.D. Tex. Dec. 15, 2022) ("The Hague Convention reasons that the best interest of the child is well served when decisions regarding custody rights are made in the country of habitual residence.").

### A. *Prima Facie* Case

73. For Petitioner to prevail on her Hague Convention claim, she must establish three elements by a preponderance of the evidence: (1) that the Respondent removed or retained the child somewhere other than the child's habitual residence; (2) that the removal or retention violated the Petitioner's rights of custody under the habitual-residence nation's laws; and (3) that at the time of removal or retention, Petitioner was exercising those rights or would have exercised those rights but for the removal or retention. *Delgado*, 837 F.3d at 577.

### 1. The children's habitual residence is Canada.

74. "A child's habitual residence is '[t]he place where a child is at home [] at the time of removal or retention.'" *De La Rosa*, 2024 WL 4646975, at *3 (quoting *Monasky v. Taglieri*, 589 U.S. 68, 77 (2020)). "'[A] child's habitual residence depends on the totality of the circumstances specific to the case.'" *Smith*, 976 F.3d at 562 (quoting *Monasky*, 589 U.S. at 71). "What makes a child's residence habitual is therefore some degree of integration by the child in a social and family environment" that is "more than transitory." *Monasky*, 589 U.S. at 76–77. "A child's habitual residence, however, may be subject to change." *Pflucker v. Warms*, No. 8:21-CV-1869-WFJ-JSS, 2021 WL 4593824, at *8 (M.D. Fla. Oct. 6, 2021).

75. After a careful consideration of the record, the testimony of the witnesses at trial, the witnesses' credibility, the arguments of counsel, and the relevant caselaw, the Court finds by a preponderance of the evidence that Canada is the children's habitual residence.

76. The Court begins with a simple question: Considering the totality of the circumstances, where were the children at home when Respondent retained them in Texas? Resoundingly, the answer is Canada.

77. Petitioner and the children were well settled in Canada as of December 17, 2019, before Respondent resurfaced in the fall of 2021.

78. The Court begins by noting the evolution the children's housing situation. Petitioner testified that when she and the children first arrived in Canada on December 17, 2019, Petitioner and the children stayed with Petitioner's parents (Dkt. #57 at p. 13). This was merely a temporary arrangement because, at the time, that was Petitioner's intention. However, as time passed, Petitioner realized their stay in Canada would require more than merely residing with her parents. Accordingly, Petitioner and the children moved into an apartment in Canada (Dkt. #57 at p. 14). Later, Petitioner and the children moved into a house (Dkt. #57 at p. 15).

79. Further, the children have established medical providers in Canada that have been integral in maintaining the children's health throughout their years in the country. The children also have attended school in Canada from their arrival in December of 2019 until they were retained in Texas in the summer of 2024. Petitioner testified that the children have a substantial number of friends from school, spend time with children in the neighborhood, and play sports in Canada. This testimony is bolstered by other evidence in the record, such as photos of the children with their friends on vacations, at school, and spending time together (Dkt. #54-3). The children's relationships with friends, family, schools, teammates on sports teams, and medical professionals indicate a "degree of integration by the child[ren] in a social and family environment" that is "more than transitory." *Monasky*, 589 U.S. at 76–77.

80. The children's age from when they first arrived in Canada until their retention in Texas further convinces the Court that the children's habitual residence is Canada. When the children arrived in Canada on December 17, 2019, W.F.W. was four and C.C.W. was two. When the

17

children were retained in Texas in August of 2024, the children had spent more than half their lives in Canada. It would be odd to conclude that Texas—a location they had not lived in permanently for almost five years—is their place of habitual residence.

81. The Court is also convinced by Petitioner's testimony. At trial, Petitioner testified that the move to Canada began as a temporary arrangement but transformed into a permanent move once she and the children settled into Canada and did not hear from Respondent for over two years. The Court is convinced that after that transformation, the children's habitual residence became Canada. *See Pflucker*, 2021 WL 4593824, at *8 ("A child's habitual residence, however, may be subject to change."); *cf. Monasky*, 140 S. Ct. at 727 ("Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of *caregiving parents* are relevant considerations.") (emphasis added).

82. When Respondent retained the children in Texas, their entire world was in Canada. In sum, given the totality of the circumstances, the Court concludes by a preponderance of the evidence that the children's habitual residence is Canada.

### 2. Removal or retention of the children violated the Petitioner's rights of custody under the habitual residence nation's laws.

83. The next step in the inquiry is determining whether the removal or retention of the children violated Petitioner's custody rights under Canadian law. "The removal or retention of a child is wrongful where 'it is in breach of custody attributed to a person . . . under the law of the [country] in which the child was habitually resident immediately before the removal or retention,' and where, 'at the time of removal or retention those [custodial] rights were actually exercised . . . .'" *De La Rosa*, 2024 WL 4646975, at *3 (quoting Convention, art. 3.). "'Rights

of custody' are those rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* (quoting Convention, art. 5). Courts may take judicial notice of the law of the country of the child's habitual residence without following standard procedures for the proof of foreign law. *Id.* (citing Convention, art. 14).

84. First, the Court concludes, by a preponderance of the evidence, that Petitioner had rights of custody under Canadian law at the time of Respondent's retention of the children in Texas.

85. Petitioner's Verified Petition for Return of Children to Canada & For Issuance of Show Cause Order contained the following paragraph: "At the time the Father retained the children in the United States, the Mother had and continues to have Hague Convention article 5a rights of custody to the children under Canadian law" (Dkt. #1 ¶ 105). In his answer, Respondent admitted the factual statements in the paragraph (Dkt. #34 ¶ 105). Thus, the Court concludes that Petitioner had custody rights under Canadian law.

86. Additionally, the testimony and affidavit of Petitioner's expert on British Columbia family law, James Macdonnell, further convinces the Court that Petitioner had custody rights to the children in Canada under Section 41 of the Family Law Act (Dkt. #54-2; Dkt. #57 at p. 162).

87. Second, the Court concludes, by a preponderance of the evidence, that Respondent's retention of the children violated Petitioner's Canadian custody rights.

88. Petitioner's expert, James Macdonnell, testified and submitted an affidavit noting that Petitioner's rights of custody were in full effect when Respondent wrongfully retained the children in Texas (Dkt. #54-2). At trial, Petitioner elicited testimony that Petitioner had rights under Section 41 of the Family Law Act that were never curtailed in any way prior to Respondent retaining the children in Texas (*See* Dkt. #57 at p. 162).

89. James Macdonnell's testimony is bolstered by Justice Morley's order of September 11, 2024 (Dkt. #54-11). Once Respondent wrongfully retained the children in Texas and refused to return them to Canada (even though he represented to Justice Morley that he would return the children), Justice Morley issued an Order. The Order provided that the children were and continue to be habitual residents of British Columbia, Respondent was in breach of the court's order, and, most notably for the current analysis, required the children to be returned to the care of Petitioner (Dkt. #54-11). It would be preposterous for a judicial officer of Canada to order the children into the care of Petitioner if she did not have custody rights that were violated by Respondent's actions. Thus, the Court concludes that Respondent's retention of the children violated Petitioner's rights of custody pursuant to Canadian law.

### 3. At the time of removal or retention, Petitioner was exercising her rights of custody or would have exercised those rights but for the removal or retention.

90. The third step of the inquiry requires Petitioner to prove she was exercising her custody rights at the time of removal. Petitioner has proven, by a preponderance of the evidence, that she was exercising her valid custody rights at the time the children were retained in the United States.

91. In the Fifth Circuit, "[i]f 'a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child.*'" *Garcia v. Ramsis*, 2022 WL 287031, at *5 (E.D. Tex. Jan. 31, 2022) (quoting *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 345 (5th Cir. 2004)).

92. Petitioner has demonstrated, by a preponderance of the evidence, that she did not abandon the children. To the contrary, the record is full of examples of Petitioner caring for the children. Petitioner moved the children to Canada, enrolled them in school, ensured the children

attended necessary medical appointments, and saw that their needs were met (*E.g.*, Dkt. #54-5; Pet. Trial Exhibit 7).

93. Further, at trial, Respondent's counsel stated that Respondent does not contest that Petitioner satisfies this element (Dkt. #59 at p. 123). The Court concludes that Petitioner has proven this element by a preponderance of the evidence.

### B. Petitioner established her *prima facie* case.

94. The Court concludes that Petitioner has established her *prima facie* case. Accordingly, the Court will now address whether Respondent can establish any of his affirmative defenses.

## II. Consent Defense

95. The Court concludes that Respondent cannot satisfy the elements of the consent defense.

96. The Fifth Circuit holds that "[u]nder Article 13(a), '[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention . . . .'" *Larbie v. Larbie*, 690 F.3d 295, 308 (5th Cir. 2012) (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). "The focus of the inquiry is the petitioner's subjective intent, as evinced by the petitioner's statements or conduct, which can be rather informal." *Id.* (cleaned up). Further, "'[i]n examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account.'" *Id.* at 309 (quoting *Baxter*, 423 F.3d at 371).

97. Respondent bears the burden of proving each element of a consent defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2).

98. Respondent argues that "Petitioner has admitted to voluntarily submitting to the child custody jurisdiction in Texas by originally initiating child custody proceedings in the Texas Court,

continuing to seek child custody relief from the Texas Court through the present, and consenting to multiple temporary custody orders in Texas. Such actions establish a consent defense" (Dkt. #34 at pp. 20–21). Further, Respondent argues that the Fifth Circuit's decision in *Larbie* is directly on point, establishes that Respondent satisfies the necessary elements of the consent defense, and thus, the Court should exercise its discretion and not send the children back to Canada. 690 F.3d 295, 308–10 (5th Cir. 2012), *abrogated on other grounds by Monasky v. Taglieri*, 589 U.S. 68, 84 (2020).

99. The Court disagrees. First, *Larbie* is materially distinguishable from the case before the Court. Second, even if Respondent could meet the elements of the consent defense, the Court, exercising its discretion, would still order the children returned to Canada.

100. *Larbie* involved two Ghanian nationals—Evelyn and Derek—living in San Antonio, Texas. *Larbie*, 690 F.3d at 298. The couple married in December 2005, but the marriage soon floundered. *Id*. Derek filed for divorce in Texas state court in March 2008. *Id*. Soon afterwards, Derek received orders to report in June for training in preparation for a deployment to Afghanistan. *Id*. "Evelyn responded to Derek's divorce petition by answer and counterpetition." *Id*. Evelyn asserted that she was domiciled in Texas. *Id*. at 289–99. Given Derek's deployment, the parties entered into an agreed temporary divorce decree before the Texas court. *Id*. at 299. A few weeks after Derek deployed to Afghanistan, Evelyn traveled to London. *Id*. Notably, she took only clothing and personal effects and gave no indication that the trip was anything other than temporary. *Id*. Further, she and Derek exchanged emails that indicated "her intent to return to San Antonio." *Id*. The state court held several other hearings in which the parties actively participated to resolve various issues regarding child custody and

Evelyn's immigration status. *See id.* at 300–01. On July 2, 2009, Evelyn filed an amended counterpetition in the Texas court. *Id.* at 301. Through it, she reiterated her desire to maintain permanent residency in the United States and again represented that she was domiciled in Texas for the preceding six months. *Id.* at 302. The counterpetition also disavowed that the couple's minor child, K.L., was under the continuing jurisdiction of any other court. *Id.* Once Derek returned from Afghanistan, the divorce proceedings turned to discovery. *Id.* at 303. Evelyn failed to comply with certain discovery requests, causing the Texas court to impose sanctions for violations of its orders, which Evelyn paid. *Id.* at 303–04. On March 1 and 2, 2010, the Texas court heard arguments in which both Evelyn and Derek testified. *Id.* at 304. On May 25, 2010, the Texas court entered a final divorce decree which, among other things, appointed Derek and Evelyn as joint managing conservators of K.L., with Derek as the possessory parent. *Id.* On February 25, 2011—almost a year after the final divorce decree—Evelyn filed a Hague Convention petition in the United States District Court for the Western District of Texas. *Id.* at 304. The district court granted the petition, which the Fifth Circuit eventually vacated. *Id.* at 298. The Fifth Circuit rendered judgment for Derek because it determined that Evelyn consented to the Texas court making a final custody determination. *Id.* The Fifth Circuit stated that "[c]rucially, consent for a particular tribunal to make a final custody determination— which *may* be established by entry of a temporary custody order—suffices to establish an affirmative defense under the Convention." *Id.* at 309 (emphasis added). The Fifth Circuit then noted several facts suggesting that Evelyn consented to the Texas court making a final custody determination. *Id.* at 309. These facts included Evelyn answering the divorce lawsuit, filing a counterpetition seeking affirmative relief, participating in the divorce trial, appealing

the final decree, moving the Texas court to modify its term, obeying the Texas court's orders, and not initiating custody proceedings in the United Kingdom. *Id.*

101.    The Court recognizes that *some* facts from *Larbie* are similar to the case at bar. The greater weight of facts, however, deviate from *Larbie,* as explained below.

102.    From the outset, there is a stark difference between *Larbie* and this case. Respondent heavily relies on a single, cherry-picked sentence from *Larbie,* which states that "[c]rucially, consent for a particular tribunal to make a final custody determination—which may be established by entry of a temporary custody order—suffices to establish an affirmative defense under the Convention." *Id.* at 309. The Court, however, must read that sentence within the context of the entire decision in *Larbie. Cf.* BRYAN A. GARNER & ANTONIN SCALIA, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is a primary determinant of meaning."). In *Larbie*, the Fifth Circuit began by noting the district court effectively "reverse[d] a custody order entered after lengthy proceedings, culminating in a *final divorce* and *custody order*, in which *neither party objected* to the state court's jurisdiction." *Larbie*, 690 F.3d at 298 (emphasis added). Here, crucially, the Texas Court has not entered a final divorce and custody order. Indeed, the proceedings are ongoing. This greatly contrasts *Larbie* in which Evelyn filed her petition nine months after the Texas state court entered a final divorce decree and decided the custody issue, and her appeal failed in the state court system. *See Larbie*, 690 F.3d at 304. Accordingly, determining that the proceedings should take place in Canada is not an affront to the aims of the Convention like in *Larbie*. Thus, this fact greatly distinguishes *Larbie* from the case at bar.

24

103.     Further, in this case, Petitioner objected to the Texas Court's jurisdiction over the custody proceedings. While it is true that Petitioner initiated the divorce proceedings in the Texas Court, at that time, there was no other court that could hear the divorce claim. *See infra* ¶¶ 112–13. And, after Petitioner and the children became habitual residents of Canada, Petitioner sought to have the Canadian courts resolve the parent-child relationship rather than the Texas Court (*See, e.g.*, Dkt. #17-21; Dkt. #17-16; Dkt. #17-11). Thus, even if Petitioner initially consented to the Texas Court resolving the dispute when the proceedings commenced, that consent was revoked by reestablishing the children's habitual residence in Canada. Moreover, the Court finds Respondent's argument on this point unpersuasive. Respondent argues that because Petitioner initiated the proceedings in the Texas Court, no other court could ever possess jurisdiction over the parent-child relationship. This argument cannot be correct. To illustrate the flaws in that argument, imagine a situation in which a parent and child receive permission from a Texas state court to leave for another country under a temporary order. Suppose, for whatever reason, the divorce and custody proceedings are not finalized for several years. Ten years pass and the case is still pending before the Texas state court. Meanwhile, the parent and child have built a new life for themselves in another country. The child has close ties to the parent's family in the foreign jurisdiction, has strong ties to the community, attends school, participates in religious functions, lives in a house with his own bedroom, and has not been in contact with the other parent. One day, the Texas state court proceedings pick back up due to a motion by the other parent. It would be an absurd result if the Texas state court could assert jurisdiction and hale the parent and child living abroad for a decade back into the Lone Star State because only the Texas courts can decide the parent-child relationship. This

scenario, however, is exactly what could transpire if the Court adopted Respondent's argument on this point. This, the Court will not do. In this case, Petitioner and the children relocated to Canada on the basis of a temporary order (Dkt. #55-1 at pp. 70–72). But, as years passed, the move to Canada became permanent. Petitioner and the children did not hear from Respondent for almost two years and built a new life in Canada (Dkt. #57 at p. 25). Accordingly, the Court concludes that once this occurred, the habitual residence of the children changed, the Canadian courts became better suited to handle the parent-child relationship, and Petitioner no longer consented to the Texas Court's jurisdiction over the parent-child relationship.

104.    Respondent also notes how Petitioner has participated in several hearings before the Texas Court, sought relief from the Texas appellate courts, and consented to the extension of a temporary *ex parte* restraining order (*See, e.g.*, Dkt. #35 at ¶ 21; Dkt. #55-1 at p. 174). Thus, according to Respondent, Petitioner consented to the Texas Court deciding the parent-child relationship. Not so. First, as the Court has previously noted, when the Texas Court refused to transfer the parent-child relationship dispute to the Canadian court, Petitioner continued to participate in the Texas Court proceedings (*See* Dkt. #31 at p. 4). Petitioner cannot be penalized for complying with orders in the Texas Court—her failure to comply would likely lead to sanctions. Second, by Respondent's own logic, the Court could just as easily find that Respondent consented to the Canadian court's jurisdiction over the matter, given his participation in the proceedings in Canada, such as consenting to Justice Morley's Order on August 2, 2024, permitting Respondent to take custody of the children during the summer (Dkt. #54-9). Again, the Court concludes that these facts do not support a conclusion that Petitioner consented to the Texas Court's jurisdiction to make a final custody determination,

especially since she repeatedly moved the Texas Court to transfer the parent-child relationship dispute to the Canadian court (*See, e.g.*, Dkt. #17-21; Dkt. #17-16; Dkt. #17-11).

105.   The case at bar is also distinct from *Larbie* because, unlike Evelyn, Petitioner *did* initiate custody proceedings in Canada before the Texas Court rendered a final decision (Dkt. #54-6). This action bolsters Petitioner's position that the Canadian court should decide the parent-child relationship. This greatly differs from *Larbie*, where Evelyn consistently represented throughout the entirety of the proceedings that she was domiciled in Texas. *See Larbie*, 690 F.3d at 299, 302.

106.   In sum, the Court concludes that *Larbie* is easily distinguishable, and the consent defense does not apply to the case at bar.

107.   Even if Respondent satisfied the elements of the exception—which he has not—the Court would exercise its discretion declining to apply the exception and order the children returned to Canada. *England v. England*, 234 F.3d 268, 270–71 (5th Cir. 2000) ("[A] federal court has and should use when appropriate the discretion to return a child to his or her place of habitual residence if return would further the aims of the Convention.") (cleaned up); *see also Garcia v. Pinelo*, 808 F.3d 1158, 1167 (7th Cir. 2015) ("[Other Circuits and the U.S. Department of State] have said that a district court retains discretion not to apply an exception . . . ."); *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007) (same); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (same). "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20. Here, decisions regarding custody rights should be made in the country of habitual residence—Canada.

### III. Judicial Estoppel

108.    The Court concludes that the doctrine of judicial estoppel is inapplicable to this case.

109.    Judicial estoppel in the Fifth Circuit requires two elements: "(1) the position of the party being estopped must be clearly inconsistent with its previous position; and (2) that party must have convinced the court to accept the previous position." *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 117 F.4th 628, 638 (5th Cir. 2024) (cleaned up). Courts also consider "whether absent estoppel the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the imposing party." *Id.* (cleaned up).

110.    Respondent's argument that judicial estoppel should apply fails because the first element is not met. Petitioner's current position is not clearly inconsistent with her previous position.

111.    Respondent faults Petitioner for initiating divorce proceedings in the Texas Court and, years later, arguing instead that Canadian courts should determine the child custody issue, while also litigating in the Texas Court. This position is not clearly inconsistent.

112.    The Court takes judicial notice that, under Texas law, "a suit for divorce may not be maintained in [Texas] unless at the time the suit is filed either the petitioner or the respondent has been: (1) a domiciliary of [Texas] for the preceding six-month period; and (2) a resident of the county in which the suit is filed for the preceding 90-day period." *Matter of Marriage of Vaugh*, No. 10-21-00167-CV, 2024 WL 4558961, at *1 (Tex. App. Oct. 24, 2024) (citing TEX. FAM. CODE. ANN. § 6.301).

113.    When Petitioner initiated divorce proceedings in the Texas Court, she and Respondent were domiciled in Dallas County, Texas. At that time, there was no other location for Petitioner to initiate proceedings at which she could obtain legal possession of the children—Petitioner had to commence proceedings in the Texas Court. *See Williams v. North Carolina*, 325 U.S.

226, 229 (1945) ("Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil[e]. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it.").

114.    In fact, if Petitioner had moved to Canada with the children and initiated proceedings regarding their custody in Canadian courts, Respondent would have been within his rights to call law enforcement and claim that his children had been kidnapped. *See generally* 28 U.S.C. § 1204. Thus, Petitioner used the only mechanism available to her—the Texas courts—to obtain the right to gain possession of her children and to obtain the legal right to travel with them internationally without Respondent's consent.

115.    It was only once Petitioner and the children had lived in Canada for years (some of which Respondent had been entirely absent from their lives), that Respondent filed a Motion for Enforcement in the Texas Court. On June 24, 2022, the Texas Court ordered Petitioner to appear on July 11, 2022 (Dkt. #17, Exhibit 23). At this point, it had been over two years since Petitioner and the children moved out of Texas and reestablished themselves in Canada—the children's habitual residence.

116.    Accordingly, on July 7, 2022, Petitioner filed a Motion to Bifurcate and Transfer in the Texas Court, requesting that the Texas Court transfer the suit affecting the parent-child relationship to the Canadian courts (Dkt. #17, Exhibit 21). This position is not clearly inconsistent with Petitioner's decision to initiate divorce proceedings in the Texas Court. Once the Petitioner and the children became habitual residents of Canada and Respondent sought relief in the Texas Court, Petitioner opposed the Texas Court's jurisdiction to decide the

parent-child relationship. Petitioner quickly sought to have the proceedings transferred to the Canadian court because the children were, in 2022, habitual residents of Canada (Dkt. #17, Exhibit 21).

117.    Because Petitioner's position is not clearly inconsistent, the Court concludes that Respondent cannot prove the first element of the judicial estoppel doctrine.

118.    Again, even if Respondent satisfied the elements of judicial estoppel—which he has not— the Court would exercise its discretion by declining to apply the exception and order the children returned to Canada. *See Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (noting that judicial estoppel is an equitable doctrine, and the decision whether to invoke it is within the court's discretion); *see also England*, 234 F.3d at 270–71 ("[A] federal court has and should use when appropriate the discretion to return a child to his or her place of habitual residence if return would further the aims of the Convention.") (cleaned up); *see also Garcia*, 808 F.3d at 1167 ("[Other Circuits and the U.S. Department of State] have said that a district court retains discretion not to apply an exception. . . ."); *de Silva*, 481 F.3d at 1285 (same); *Baran*, 526 F.3d at 1345 (same). "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20. Applying the doctrine of judicial estoppel in this case would undermine the Convention's goal that decisions regarding custody rights should be made in the country of habitual residence—here, Canada.

## IV. The Age and Maturity Exception

119.    The Court concludes that Respondent cannot satisfy the elements of the age and maturity exception.

120.    The Hague Convention establishes that "a court may refuse to order the return of a child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Rodriguez v. Yanez*, 817 F.3d 466, 473 (5th Cir. 2016) (cleaned up). "[W]hether a child is of sufficient age and maturity is a fact-intensive process." *Dietz v. Dietz*, 349 F. App'x 930, 934 (5th Cir. 2009). Respondent bears the burden of proving that this exception applies. *Rodriguez*, 817 F.3d at 473. To prevail, Respondent must prove two distinct elements: (1) that W.F.W. "has attained an age and degree of maturity at which it is appropriate to take account of his views;" and (2) that W.F.W. objects to being returned to Canada. *See id.* at 474 (cleaned up). The Fifth Circuit instructs district courts to apply all exceptions to the Hague Convention narrowly. *Id.*

121.    Respondent fails to prove the first element—that W.F.W. has attained an age and degree of maturity at which it is appropriate to take his views into account.

122.    First, the Court is not persuaded by the expert report of Respondent's expert, Dr. Andrea Wierzchowski (Dkt. #55-5 at pp. 36–52). Instead, the Court credits the testimony and report of Petitioner's expert, Dr. Peter Favaro, who believes that W.F.W. is not sufficiently mature to make a decision about where he wants to live (Dkt. #54-19; Dkt. #57 at pp. 181–218).

123.    Second, the guardian ad litem also concluded that the age and maturity exception should not apply to W.F.W. The guardian ad litem noted that W.F.W. is nine, which is notably younger than the average age of most minors to whom courts have generally extended the exception, which seems to be twelve years old or older (Dkt. #38 at p. 6). The Fifth Circuit "has declined to hold, as a matter of law, that any particular age is sufficient or insufficient to meet the defense." *Rodriguez*, 817 F.3d at 474 (cleaned up). However, in this specific

circumstance, the Court concludes that W.F.W.'s young age weighs against applying the age and maturity exception. The guardian ad litem's observations, such as W.F.W.'s difficulty to remain seated during their interview, the fact that he required guidance and help eating his meal, that he sat under the table and in a corner during parts of their interview, and that he was easily distracted throughout the interview, bolsters this conclusion (Dkt. #38 at pp. 6–7).

124.    Third, the Court conducted an *in camera* interview with W.F.W. *See Vasconcelos v. Batista*, 512 F. App'x 403, 406 (5th Cir. 2013) (recognizing that an *in camera* interview with the minor child was a proper basis for the district court's age and maturity findings). The Court carefully questioned W.F.W. Importantly, W.F.W. did not appear to understand the proceedings before the Court (*See* Dkt. #58 at pp. 18–19). Further, W.F.W. had difficulty responding to several of the Court's questions. The Court asked W.F.W. what his favorite subject in school was and W.F.W. responded that it was math (Dkt. #58 at p. 8). When the Court asked W.F.W. why he liked math, W.F.W. had difficulty articulating a response, though he did eventually mention he enjoyed the challenge of the subject (Dkt. #58 at pp. 8–9). Further, W.F.W. indicated that he enjoyed soccer. Again, when asked by the Court why he liked soccer, W.F.W. struggled to describe why he enjoyed the sport (Dkt. #58 at pp. 9–10). W.F.W. indicated that he enjoyed video games and mentioned that one of his favorite video games to play with Respondent is Fortnite, while his favorite video game to play with Petitioner is Super Smash Bros. (Dkt. #58 at pp. 12–15). The Court noted to W.F.W. its own experience playing Super Smash Bros. but expressed its lack of familiarity with Fortnite (Dkt. #58 at pp. 12–15). W.F.W. was able to describe Fortnite rather clearly and his answer as to why he liked it was more substantive than W.F.W.'s responses as to why he liked math or enjoyed soccer (*See* Dkt. #58 at pp. 12–15). The

Court, however, still had to repeatedly prompt W.F.W. to explain all of his answers more fully because they were rather terse.

125.    The Court concludes that any of the aforementioned reasons alone would be sufficient to conclude that W.F.W. has not attained an age and degree of maturity at which it is appropriate to take his views into account. Put together, these reasons convince the Court that the age and maturity exception does not apply to W.F.W.

126.    The Court also concludes that Respondent cannot prove the second element—that W.F.W. objects to being returned to Canada. *See Rodriguez*, 817 F.3d at 474.

127.    Crucially, during the *in camera* review, W.F.W. did not object to being returned to Canada. W.F.W. only mentioned a preference for remaining in Texas (Dkt. #58 at pp. 17–18). But it is well established that a preference is insufficient to trigger the age and maturity exception; rather, "[o]nly an objection is sufficient to trump the Convention's strong presumption in favor of return." *Rodriguez*, 817 F.3d at 477. Accordingly, the Court finds that Respondent cannot prove the second fact either.

128.    It is clear to the Court that W.F.W. is a bright child who loves, and is loved by, both Petitioner and Respondent. However, the Court concludes that the age and maturity exception does not apply to W.F.W. because Respondent did not prove either of its elements.

129.    Once again, even if Respondent satisfied the elements of the exception—which he has not—the Court would exercise its discretion by not applying the exception and order the children returned to Canada. *England*, 234 F.3d at 270–71 ("[A] federal court has and should use when appropriate the discretion to return a child to his or her place of habitual residence if return would further the aims of the Convention.") (cleaned up); *see also Garcia*, 808 F.3d at

1167 ("[Other Circuits and the U.S. Department of State] have said that a district court retains discretion not to apply an exception. . . ."); *de Silva*, 481 F.3d at 1285 (same); *Baran*, 526 F.3d at 1345 (same). "The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20. Here, decisions regarding custody rights should be made in the country of habitual residence—Canada.

130.    The Court also notes that the exception has only been asserted as to W.F.W., meaning that if the Court were to conclude that the exception applied, W.F.W. would remain in Texas, while C.C.W. would be returned to Canada. Petitioner, Respondent, and the guardian ad litem represented to the Court that splitting the children up would be devastating to them given how close they are with one another. During its *in camera* interview, the Court witnessed firsthand how close the children are with one another and finds that splitting them up would undermine the goals of the Convention. This also suggests to the Court that it should exercise its discretion and order the children be returned to Canada together.

## CONCLUSION

It is therefore **ORDERED** that the Verified Petition For Return Of Children To Canada & For Issuance Of Show Cause Order (Dkt. #1) is hereby **GRANTED**. The Canadian court must decide the custody dispute.

It is further **ORDERED** that W.F.W. and C.C.W. are to be immediately returned to Canada to the custody and possession of Petitioner with all costs and expenses of such return to be borne by Respondent. *See* 22 U.S.C. § 9007(b)(3). Respondent shall turn the children over to Petitioner by no later than 3 p.m. CST on January 27, 2025.

Petitioner, Respondent, and counsel for the parties are **CAUTIONED** that, if needed, the Court will order further relief to effectuate compliance with this Order. *Shillitani v. United States*, 384 U.S. 364, 369 (1966) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt.").

The Clerk is **DIRECTED** to send a copy of this Order to the 303rd Judicial District Court in Dallas County, Texas.

**IT IS SO ORDERED.**

 **SIGNED this 17th day of January, 2025.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE